[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10561

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

KATRINA LAWSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 3:21-cr-00006-TCB-RGV-1

_____

Before BRANCH, LAGOA, and KIDD, Circuit Judges.

PER CURIAM:

Katrina Lawson appeals her convictions for wire fraud, bank fraud, mail fraud, and money laundering stemming from a fraudulent loan application scheme involving COVID-19 pandemic-related relief programs for businesses. She argues on appeal that (1) the district court erred in denying her motion to suppress the evidence seized from her cellphone based on the government's unreasonable delay in obtaining a search warrant, and (2) the evidence was insufficient to sustain her convictions for wire fraud (Counts 2–8), mail fraud (Count 12), bank fraud (Counts 10 and 11), and money laundering (Count 13).[1] After careful review, we affirm.

## I.     Background

In 2021, a grand jury indicted Lawson, and several others, on one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349 (Count One); eight counts of wire fraud, in violation of 18 U.S.C. §§ 2 and 1343 (Counts Two through Nine); two counts of bank fraud, in violation of 18 U.S.C. §§ 2 and 1344 (Counts Ten and Eleven); one count of mail fraud, in violation of 18 U.S.C. §§ 2 and 1341 (Count Twelve); and one count of money

---

[1] Lawson was also convicted of conspiracy to commit wire fraud (Count 1) and wire fraud (Count 9), but she does not challenge those convictions in this appeal.

laundering, in violation of 18 U.S.C. § 1957 (Count Thirteen). The indictment generally alleged that Lawson and others conspired and engaged in a fraudulent loan application scheme involving COVID-19 pandemic-related relief loan programs for businesses offered by the Small Business Administration ("SBA"). The scheme involved Lawson and others recruiting applicants and completing loan applications knowingly using false information. And, in exchange for completing the fraudulent loan applications, Lawson collected a fee, which she had deposited in several different bank accounts. According to the indictment, Lawson also used proceeds from the scheme to purchase a Mercedes.

### A. Facts related to the motion to suppress

Law enforcement arrested Lawson on March 18, 2021, and seized a cell phone in her possession. Lawson subsequently moved to suppress all evidence from the cell phone, arguing that there was an unreasonable delay of almost two weeks between the March 18, 2021, seizure of her phone and law enforcement securing a search warrant for the phone on March 31, 2021. She argued that this delay violated her right to be free from unreasonable searches and seizures because the government had no compelling justification for the delay.

Prior to the government filing a response, the district court held an evidentiary hearing on the motion. United States Postal Inspector Agent Daryl Greenberg testified to the following. Greenberg was the sole agent assigned to the case. On March 18, 2021, he "orchestrated a ten-person arrest operation

simultaneously in five different states" in relation to this case.[2] That same day, Greenberg secured four bank seizure warrants and three vehicle seizure warrants. Greenberg explained that this was not a simple investigation because of the number of people involved in the alleged fraudulent scheme.

As part of the nationwide arrest operation, law enforcement arrested Lawson at her home in Houston, Texas, and officers seized a cell phone from her closet, which she claimed, "was dead." She declined to provide the password to unlock the phone. An agent brought the phone from Houston to Atlanta the next day (which was a Friday) and logged it into evidence. That day, Greenberg successfully located the two remaining individuals for arrest, aided in their processing, attempted an interview of one of those persons, and attempted to serve the bank seizure warrants. Over the weekend, he began the process of "documenting and entering all this information from all the arrests in . . . [the] case management system." On March 22, Greenberg took custody of Lawson's phone. However, at that same time, he learned that Alicia Quarterman,[3] one of the co-conspirators, was trying to transfer funds out of some of the subject bank accounts, so he drove to the facility where she was being held in Lovejoy, Georgia to pick up copies of the jail call transcripts, and began reviewing

---

[2] Only eight of the ten targets were arrested that day as two could not be located.

[3] Because several members of the conspiracy have the last name Quarterman, we refer to these individuals by their first names as necessary.

those calls. Greenberg explained that his primary focus was on securing subpoenas and seizure warrants for the bank accounts because "the money was not secured," while Lawson's cell phone was secured in evidence.

The next day, March 23—three business days after Lawson's arrest—Greenberg began working on the search warrant application for Lawson's phone, testified at Alicia's detention hearing, worked on additional bank and vehicle seizure warrants, and completed other case management tasks. He was the only case agent working on any of the seizure warrants. He also learned that Lawson was trying to move funds in her approximately 12 to 14 bank accounts, so he shifted tasks and began focusing on her bank accounts and made a "funds movement chart." On March 25, Greenberg catalogued evidence, reviewed interviews with other co-conspirators for information that should be included in the search warrant application for Lawson's phone, and he sent a draft of the application to the United States Attorney's Office. At that same time, Greenberg's work computer crashed and had to be replaced and his information transferred to the new computer, which delayed his work.

On Friday, March 26, Greenberg continued working on the search warrant application for Lawson's phone by incorporating notes and edits from the U.S. Attorney's Office, as well as new information obtained from post-arrest interviews of other members of the conspiracy, and he worked on updating the case files. On the next business day, March 29, Greenberg sent a revised

draft of the search warrant application for Lawson's phone to the prosecutor and they "continued to go back and forth on" clarifying edits. On March 30, Greenberg sent the finalized version of the 20-page search warrant application to the prosecutor, and it was submitted to a judge. The judge granted the search warrant application for the phone the following day (along with several other seizure warrants for other bank accounts and property). Greenberg confirmed that, at no point between the seizure of Lawson's cell phone and obtaining the search warrant did Lawson request the return of her phone.

Lawson emphasized through her lengthy cross-examination of Greenberg at the hearing and in her post-hearing supplemental motion to suppress that the "bulk" of the search warrant application was copied from other sources, such as the indictment; used boilerplate language; or was based on information that Greenberg would have had prior to Lawson's arrest. Lawson maintained that the 20-page application contained "less than three double-spaced pages of original content." Thus, she argued that it should not have taken Greenberg as long as it did to prepare the application, and the delay was unreasonable and warranted suppression of the evidence.[4]

A magistrate judge entered a report and recommendation ("R&R"), recommending that the motion to suppress be denied after concluding that Greenberg did not unreasonably delay in

---

[4] She also argued that the information contained in the search warrant affidavit was stale, but she does not advance that argument in this appeal.

obtaining the search warrant. In reaching this conclusion, the magistrate judge identified several factors this Court considers in determining whether a delay is reasonable including: (1) "the significance of the interference with the person's possessory interest"; (2) the duration of the delay; (3) whether it was a consensual seizure; and (4) "the government's legitimate interest in holding the property as evidence." As for the first factor, the magistrate judge noted that Lawson's phone was not operational at the time of its seizure and she never requested the return of the phone, which diminished any contention that there was significant interference with her possessory interest. Second, the magistrate judge concluded that the 12-day delay between the seizure and submission of the search warrant application was "relatively short" and justified particularly in light of the fact that Greenberg was the sole case agent in this highly complex case and had many competing tasks that also required his attention. Finally, the fourth factor weighed heavily in the government's favor because cell phones were integral to the fraud scheme, and Lawson was considered a ringleader of the scheme.

Lawson objected to the R&R, arguing that the delayed search of her phone was unconstitutional because: (1) cell phones store a vast amount of personal and private information, regardless of whether they are operational, which strengthens her possessory interest in the phone; (2) the search warrant affidavit contained largely duplicative information to that found in the indictment, establishing that there was no compelling justification for the delay; (3) she did not consent to the seizure of her phone, so her

failure to request its return should not be interpreted as weighing in the government's favor; and (4) while the government had an interest in searching Lawson's phone, that interest did not overcome Lawson's possessory interest or the fact that the government already had potentially incriminating text messages from a codefendant's phone, lessening the relative importance of Lawson's phone.

The district court adopted the R&R and overruled Lawson's objections.  The case ultimately proceeded to trial.

### B.  The Trial

At trial, the government presented evidence that, in 2020 in the face of the COVID-19 pandemic, Congress, via the CARES Act, authorized the SBA to provide Economic Injury Disaster Loans ("EIDL") related to the pandemic.  An EIDL loan is "a working capital loan intended to assist small businesses meet operating expenses that they[] [were] unable to meet because of a particular disaster."[5]  Because of the need to provide financial assistance quickly during the pandemic and the need to process as many applications as possible in an efficient time frame, Congress relaxed some of the typical requirements to qualify for an EIDL loan—including that borrowers did not have to provide a tax transcript or supporting documents to verify their business operations—and authorized SBA to advance EIDL applicants up to $10,000 regardless of whether the loan was ultimately approved.  To

---

[5] SBA has had an EIDL program since 1953.

24-10561                Opinion of the Court                9

qualify for an EIDL loan, a business had to be operational as of February 1, 2020. Businesses could use EIDL loans and advances only as "working capital" to meet operating expenses, such as payroll, rent, utility payments, and servicing existing debt, and the advances could not be used for personal expenses.

Applicants submitted EIDL applications electronically directly to SBA. The applications contained certain information about the business, including, the business's legal name, the type of organization, location of the business, gross revenues, the number of employees, contact information, the date on which the business was established, the business's purported activity, and bank account information. SBA determined the amount of the EIDL advance based on the number of reported employees— $1,000 per employee—up to $10,000. The SBA representative who testified did not know whether it was public knowledge that the amount of the EIDL advance was tied to the number or reported employees.

The EIDL advance was not automatic. Rather, if an applicant wanted the EIDL advance, the applicant had to check a box. The advances did not have to be paid back even if SBA ultimately denied the loan application. SBA ran a credit check on applicants, but otherwise did not obtain supporting documentation for these pandemic-related EIDL loans; therefore, it relied heavily on the accuracy of the information in the application to determine whether to disburse any funds. Any misrepresentations in the

application as to the business itself, the operational date, or the number of employees would have been material to SBA.

Finally, the EIDL application contained a section for the applicant to disclose that the application was prepared by a third party and any fee charged. However, the third-party preparer's fee could not be paid from the EIDL advance or loan and instead had to be paid separately. The application also contained "certifications" in which an applicant attested under penalty of perjury that the information provided was truthful and accurate.

Congress also established a second loan program to assist small businesses during the pandemic—the Paycheck Protection Program ("PPP")—which were 100 percent guaranteed by SBA. Recipients of PPP loans had to use at least 60 percent of the loan on payroll, while the rest could be used to cover other business-related expenses. The funds could not be used for personal expenses. The rules and requirements for the PPP program were published in the Federal Register and posted on SBA's and the Department of Treasury's websites.

To be eligible for a PPP loan, a business had to be operational as of February 15, 2020, and have fewer than 500 employees. To obtain a PPP loan, a business submitted an electronic application to an approved financial institution (such as a bank), and the financial institution then made the decision as to whether to approve the loan, and, if approved, the institution

requested a guarantee from SBA.[6]   The application included information about the business's structure, location, contact information, and average monthly payroll.  The applicant certified that the information provided was true and accurate.

Notably, applicants seeking a PPP loan had to provide some supporting documentation, such as tax documents that demonstrated that the business was operational as of February 15, 2020; the number of employees; and the payroll for the last 12 months, which was used to calculate the maximum loan eligibility amount.  Because the PPP program "was designed . . . to get the relief out the door as quickly as possible," lenders were not required to independently verify the veracity of the information in the application or supporting documents.   Thus, any representations made in a PPP application were important to both the lender and SBA, as the guarantor of the loan.  Applicants could have a third-party assist them with filling out the application for a fee, but the fee could not come out of the loan proceeds.

With this background in mind, we turn to the testimony related to the specific scheme in this case.  In August 2020, Postal Inspector Agent Jonathon Banks executed a search warrant at Alicia Quarterman's home in connection with a separate narcotics

---

[6] Under the program, if the business "used the proceeds for only authorized purposes and used a minimum of 60 percent on payroll costs, the loan could be forgiven in full."

investigation.[7]  During the execution of the search warrant, Banks seized a notebook from Alicia's home that contained names of various individuals, personal identifying information such as social security numbers and dates of birth, bank account information, and notations next to the names of "PPP" and "EIDL," which led Banks to believe there was potential financial fraud occurring. Accordingly, Banks turned the notebook over to Inspector Greenberg, who was a fraud investigator.

Law enforcement obtained numerous texts from Alicia's cell phone between Alicia, Lawson, and other codefendants that discussed PPP and EIDL loans, exchanged personal identifying information for various individuals, and included screenshots of completed applications.  The search of Lawson's cell phone revealed similar messages.  For instance, on July 1, 2020, Lawson texted Alicia the following:

> [Lawson]:  I got another money maker for us and I'll do your[s] for free[,] but get some people together and I'm charging $1000 per application.  I'll call you once I get off
>
> [Alicia]:  Is this a loan or a grant?  Do they have to pay it bk?
>
> [Lawson]:  You don't have to pay it back

---

[7] Banks testified that postal inspectors "investigat[e] crimes involving the U.S. mail" where individuals use the mail to facilitate certain crimes.

24-10561                 Opinion of the Court                      13

…

[Alicia]:  Ok, text me exactly what to say to it's no misunderstanding.  I'm out with my friend Bug now. He said, let's run it.  He's ready now.  I'll have more people when you get off

[Lawson]: Ok bet[8]

. . .

So we are going to charge $2000 for me to do the application, they will get 10,000 deposited in there [sic] account and they got to send me $2,000 and I'll split it with you for every person you get.  So we each can get $1000 a piece off each person

…

So the wording to everyone will be we going to get you $8,000 for COVID disaster relief money for a homeowner, renter or sole proprietor, but the cost will be $2000.

. . .

[Alicia]:  What all do you need from them?  Name, account # and social?

---

[8] Following this text, Lawson sent Alicia a screenshot of the EIDL application from SBA's website.

[Lawson]:  Also need Address, birthday, email and place of birth.  Can't have no felony within past year

[Lawson]:  Oh and bank name

[Alicia]: Ok

[Lawson]:  What name you want to use for your business

[Lawson]:  Send me all your info I'm doing yours now

Lawson then sent Alicia a picture of a completed EIDL loan application.

There were many other texts about the EIDL and PPP loan scheme discussed at trial between Lawson and Alicia and Lawson and other individuals.  For instance, in a text between Lawson and a woman named Latrell Solomon, Lawson asked Solomon whether she had "ever received a 1099 at all in 2019" for "side hustle money."  Solomon stated she had not and just had her "regular wages."  Lawson responded, "You know this is what this grant is for, independent contractors who have a side hustle, lol."  And when Solomon asked whether that fact meant that she would not get the grant, Lawson stated "No, it doesn't mean that.  I just want you to know what you are applying for, ma'am."  Lawson then told Solomon that she had listed that Solomon did "hair" on the application.

In another text regarding the EIDL applications an individual asked Lawson what she listed as the business for a

particular applicant, and Lawson replied "Everyone is the same, independent contractor. Had ten employees. No one has nothing different outside of that, except the type of job they performed."

Inspector Greenberg obtained records for the bank accounts referenced in the text messages between Lawson and Alicia and retrieved the related EIDL and PPP applications from SBA, many of which were submitted from the same IP address. Greenberg determined that Lawson filed at least 200 EIDL applications, but she did not disclose that she was the third-party preparer. Greenberg reached out to the secretary of state "for the state that the [applicants] lived" to determine if the applicants had registered businesses. He also checked with the Georgia Secretary of State for all of the businesses. But numerous applicants for whom Lawson submitted applications did not have any registered businesses in Georgia, including Lawson, Tranesha Quarterman, Nikia Wakefield, Daryl Washington, Adarin Jones, Katie Quarterman, India Middleton, Victor Montgomery, Arielle Dozier, and Jeffrey Moffett.

The wire fraud charges in Counts 2 through 8 were based on fraudulent EIDL applications for specific applicants. The government presented the following evidence related to those counts.

- Wire-Fraud—Count Two (Tranesha Quarterman): Alicia texted Lawson Tranesha's information for the EIDL application. Lawson subsequently sent Alicia a screenshot of Tranesha's completed EIDL application. Tranesha's

EIDL application identified her as an independent contractor operating a hair and nail salon in Georgia with ten employees. Tranesha did not have a registered business with the Georgia Secretary of State.

- Wire Fraud—Count Three (Nikia Wakefield): Alicia texted Lawson Wakefield's information. Lawson submitted Wakefield's application stating that Wakefield was an independent contractor with an event planning business with ten employees in Maryland. Wakefield did not have a registered business with the Georgia Secretary of State.[9] Co-conspirator Victor Montgomery, who was Wakefield's boyfriend at the time of the scheme testified that Wakefield did not have a business at all. Wakefield received the $10,000 EIDL advance, and she sent $2,030 to Alicia via CashApp.

- Wire Fraud—Count Four (Darryl Washington): Alicia sent a message to Lawson with Darryl Washington's information for an EIDL application. Washington's EIDL application identified him as an independent contractor operating a "lawn and garden" business with ten employees in Georgia. Lawson sent Alicia a screenshot of the confirmation number for Washington's application, which Alicia then sent to Washington. Washington received a $10,000 EIDL advance

---

[9] Greenberg testified that he performed a search for the Maryland businesses with the Maryland Secretary of State as well, but those records were not in evidence.

from SBA.  Washington then sent $2,000 to Alicia via CashApp.  Washington did not have a registered business with the Georgia Secretary of State.

- Wire Fraud—Count Five (Adarian Jones): Alicia sent a message to Lawson with Jones's information for an EIDL application.  Jones's EIDL application indicated that he was an independent contractor with a car wash business in his name in Georgia that had 10 employees.  Jones testified that he did not have a business or any employees.[10]  The Georgia Secretary of State confirmed that Jones did not have a business registered in Georgia.[11]  SBA paid Jones an EIDL advance, and Jones paid Alicia $2,000.

- Wire Fraud—Count Six (James McFarland): Alicia texted Lawson McFarland's information for an EIDL application.  Lawson sent Alicia confirmation of the completed application.  The application indicated that McFarland was an independent contractor with a "personal services" business in Georgia with 10 employees.  McFarland did not have an active registered business in Georgia.  Instead, he had a former business registration in Georgia, but it was revoked by the Georgia Secretary of State in 2010, well

---

[10] Jones testified that he pleaded guilty to an unspecified felony charge in connection with this case, and as part of his plea agreement, he agreed to cooperate with the government.

[11] Adarin Jones also went by the name "Adrian," so Greenberg conducted a search for business registrations using both names.

before the 2020 operational dates for the two loan programs. McFarland received the $10,000 EIDL advance and paid Alicia a fee.

- Wire Fraud—Count Seven (Katie Quarterman): Alicia reached out to Katie and told her about the EIDL program and that she would get "$10,000 bk" the fee was $2,000, and Katie would "keep $8,000." Katie provided the relevant identifying information for the application. Alicia told Katie "I'll just make up a name for your business. Do you have one in mind? They have no way of checking it. A lot of people have small businesses like lawn care, hair businesses, etc." Alicia sent the information to Lawson, and Lawson told Alicia "next to Katie['s] name put [she] do hair, so if we ever have to say what business, we can go back to verify. And she established her business 7/28/15." Lawson submitted an application stating that Katie was an independent contractor with a hair and nail salon business in Georgia with ten employees. Katie did not have a registered business in Georgia. Katie received a $10,000 EIDL advance and electronically transferred $2,000 to Alicia via Zelle.

- Wire Fraud—Count Eight (India Middleton): Middleton was Alicia's cousin.[12] Alicia reached out to her about the

---

[12] Middleton testified that she pleaded guilty to a misdemeanor in relation to this case and as part of her plea agreement, she agreed to testify at Lawson's trial.

EIDL program and told her that it did not have to be a registered business, that it was for the average person who's doing babysitting or lawn service for a living." Middleton agreed and provided her information. Alicia texted Lawson Middleton's information, noting that Middleton was a sheriff. Lawson asked Alicia what type of business she should put on the application, and Alicia said "hair." Lawson filed an EIDL application for Middleton, listing her as an independent contractor who operated a hair and nail salon in Maryland with ten employees. Middleton did not receive the EIDL advance, but she did receive an EIDL loan for $5,500. Middleton testified that she did not have a hair and nail salon (although she did hair occasionally for friends and family), she was not an independent contractor, and she did not have any employees.

After receiving the fee from the applicants, Alicia would electronically transfer money to Lawson. Lawson also had various other applicants depositing money into her accounts during this time. Lawson charged anywhere from $1,000 to $3,000 for the EIDL applications.

Turning to the PPP program, the government introduced evidence that, on July 27, 2020, Lawson texted Alicia, about the PPP program stating as follows:

> You can get up to 20,000 with Paycheck [P]rotection Program. The [l]oans are 100% forgivable if you follow the PPP loan forgiveness requirements issued by the Small Business Administration (SBA). I will

> take care of the loan forgiveness document as well so you don't have to worry about that. The fee to do the loan is $6000, so you end up with $14000. The timeframe use to be 3-4 business days, but right now it's no set time for funds to be deposited into your account, but you will get it give or take 7-10 days. I will need to [sic] your February bank statement in order to proceed.

The government then presented the following evidence in support of the charges in Counts 9 through 12, which were based on fraudulent PPP applications.

- Wire Fraud—Count Nine (Middleton): After the EIDL application process, Alicia reached out to Middleton about applying for a PPP loan. Middleton agreed and provided Alicia with her bank statement and picture of her driver's license. Alicia sent this information to Lawson. Lawson submitted a PPP application for Middleton for an event planning business. Middleton never filled out the Schedule C form that was included with the application and did not have an event planning business. The application was denied. Middleton testified that the business information in the application was false.

- Bank Fraud and Mail Fraud—Counts Ten (Bank Fraud) and Twelve (Mail Fraud) (Victor Montgomery): Montgomery testified that, at the time in question, co-conspirator Nikia Wakefield was his girlfriend, and she

told him that her cousin Alicia could get him a $20,000 small business loan for a $10,000 fee.[13]  Montgomery did not have a business, but he provided the requested personal identifying information for an application. Alicia provided Montgomery's information to Lawson, and Lawson submitted a PPP loan application to FDIC-Insured Cross River Bank on Montgomery's behalf. Montgomery never saw the application or completed a Schedule C form, and he testified that the information contained therein was false.  Montgomery received a PPP loan, and he mailed Alicia a check to cover the fee (in the "for" line of the check, he wrote "family" at Alicia's request).[14]

- Bank Fraud—Count Eleven (Arielle Dozier): Alicia texted Dozier's information to Lawson, and Lawson submitted a PPP application on her behalf to Cross River Bank.   When Alicia asked about Dozier's PPP application, Lawson stated: "I do the Schedule C's first, then I go in and complete the application."  Greenberg testified that this exchange indicated that Lawson was falsifying the Schedule C tax documentation that she submitted with the applications.

---

[13] Montgomery testified that he pleaded guilty to conspiracy to commit theft of government money, and as part of his plea agreement, he agreed to cooperate with the government.

[14] The mailed check was the basis of Lawson's mail fraud charge in Count 12.

Lawson charged anywhere from $6,000 to $10,000 per person for the PPP applications. The government also presented evidence that Lawson personally applied for an EIDL and PPP loan with false information.

In addition to the evidence recounted above, the government presented evidence of conversations between Lawson and other individuals concerning EIDL and PPP applications that contained false information as well as evidence of fee payment to Lawson. For instance, Jeffrey Moffett, a former coworker of Lawson's, testified that Lawson contacted him about an EIDL advance, stating that she knew "a way to get $10,000 in a couple of days." He sent her his information, even though he did not have a business or employees, and Lawson submitted an application for him. He received the $10,000 advance, and he paid $1,000 to Lawson. Lawson later contacted him about a PPP application, indicating that he could make $20,000, and he again sent his information. He never saw the PPP application or the attachments (such as the Schedule C form), and he did not have a business. He did not receive a PPP loan.[15]

Similarly, Stephanie Robinson-Cooper, a former coworker of Lawson's, testified that Lawson reached out to her asking if she "want[ed] to make [$]10,000." At that time, Cooper worked at Home Depot as a salaried employee, and she did not work

---

[15] Moffett testified that he pleaded guilty to a misdemeanor in relation to this case and as part of his plea agreement, he agreed to cooperate with the government.

24-10561            Opinion of the Court            23

anywhere else.  When Cooper asked Lawson "what's the catch," Lawson responded "It's no catch.  Free money you don't have to pay back."  "It's a COVID relief disaster grant, and I'm charging $2,000 to complete the grant.  There are no qualifications. Everything has been waived due to Corona.  Do you want this money or what, woman?"  Lawson submitted an EIDL application on Cooper's behalf.  Cooper testified that the application contained false information—she did not have a business or employees and was not an independent contractor.  Cooper did not supply any of the business-related information in the application to Lawson, and Lawson never told her that "she was putting that information into the application."  Cooper received the EIDL advance, and paid Lawson $2,000 in split payments through Zelle and Cashapp. Lawson later contacted her about the PPP program, describing it as a $20,000 "grant" that Cooper would not have to pay back. Cooper agreed to apply and sent Lawson the additional information needed.  Cooper did not receive the PPP loan.[16]

Regarding the business registrations with Georgia's Secretary of State, Inspector Greenberg testified that he did not know what the requirements were for business registrations in Georgia and admitted that he could not "speak to" whether a business's lack of registration with the Secretary of State meant that it did not exist.  However, Dawn Boring with the Georgia

---

[16] Cooper testified that she pleaded guilty to a misdemeanor in relation to this case and as part of her plea agreement, she agreed to cooperate with the government.

Department of Labor testified that any business with employees (including independent contractors with employees) legally had to register an account with the Georgia Department of Labor because of unemployment insurance tax requirements. She performed three different types of searches for businesses associated with Lawson, Jones, Wakefield, Alicia, Washington, Tranesha, McFarland, Katie, Montgomery, Middleton, Cooper, Moffett, and Dozier, but there were no Department of Labor accounts established.

Finally, with regard to the money laundering charge in Count 13, the government presented the testimony of Linda Downing, a forensic auditor. Downing reviewed Lawson's bank accounts, focusing on the accounts that "encompassed the whole time period of the EIDL and the PPP loans, as well as monies that were received from the [EIDL and PPP loan] applicants" and used this information to trace funds Lawson used to purchase a Mercedes-Benz and other vehicles. Specifically, Lawson's accounts received approximately $180,000 in "fees" tied back to individuals receiving the EIDL advances and/or PPP loans, as well as approximately $133,000 in cash deposits. Lawson purchased the Mercedes for $74,492 by pooling together funds from five different accounts. Downing determined that a $35,000 JPMorgan Chase check used to pay in part for the Mercedes had been funded entirely by the fees Lawson received from filing the fraudulent EIDL and PPP loans. Downing also found that at least $10,000 of a $16,000 Wells Fargo cashier's check used to pay for the Mercedes had been funded by fraudulent EIDL and PPP application fees because on

July 29, 2020, the account in question had less than $1,000 in it, and by the time Lawson wrote the check, the account contained roughly $17,000, less than $4,000 of which was traceable to a source aside from application fees. However, Downing also acknowledged that it was not possible to say that a particular amount of money used by Lawson to pay for the Mercedes came from a particular source, and she also testified that it was not possible to say that none of the money that paid for the Mercedes came from non-fraudulent monetary deposits like Lawson's payroll.

Following the government's case-in-chief, Lawson moved for a judgment of acquittal on Counts 2, 3, 4, 5, 6, 7, 8, 11, 12, and 13. First, with regard to the EIDL applications, she argued that the government had failed to present any evidence from which the jury could conclude that she knew that the amount of the EIDL advance was based on the number of employees listed in the EIDL application (*i.e.*, $1,000 per employee up to $10,000).[17] Second, with regard to Counts 2, 3, 4, 6, 7, and 11, she argued that there was no evidence that the information submitted in those applications was false. Finally, with regard to the money laundering count, she argued that the government had failed to

---

[17] Lawson maintains this argument on appeal, but as we explain later in this opinion, neither the amount of the EIDL advances nor the number of employees listed in the applications are elements of wire fraud or mail fraud. Accordingly, the government was not required to prove that Lawson knew that the amount of the EIDL advance was tied to the number of employees listed in the EIDL applications.

show that more than $10,000 of the money used to pay for the Mercedes was specifically tied to money from any of the people who testified in court or the applications presented to the jury. The district court denied the motion. The defense rested, and the jury found Lawson guilty as charged on all 13 counts. The district court sentenced Lawson to a total of 135 months' imprisonment and five years' supervised release. This appeal followed.

## II.     Discussion

Lawson argues that (1) the district court erred in denying her motion to suppress; (2) the evidence was insufficient to support her convictions for wire fraud and mail fraud in Counts 2–8 and 12; (3) the evidence was insufficient to support her conviction for bank fraud in Counts 10 and 11; and (4) the evidence was insufficient to support her conviction for money laundering in Count 13. We address each argument in turn.

### A.  The Motion to Suppress

Lawson argues that the district court erred in denying her motion to suppress because the government's delay in obtaining the search warrant for her phone was unreasonable considering the relevant factors. She maintains that she had a heightened possessory and privacy interest in her cell phone because a cell phone is a highly personal device, much like a computer, that "stores a vast amount of personal and private information," and the government failed to provide a legitimate reason for why it "waited almost two weeks to take any action regarding [her] phone." She maintains that our decision in *United States v. Mitchell*, 565 F.3d 1347

(11th Cir. 2009), establishes that the delay in her case was unreasonable.

The denial of a motion to suppress presents a mixed question of law and fact, and "[w]e review a district court's findings of fact for clear error, considering all the evidence in the light most favorable to the prevailing party—in this case, the Government." *United States v. Campbell*, 26 F.4th 860, 870 (11th Cir. 2022) (en banc). "[W]e review *de novo* a district court's application of the law to those facts." *Id.*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 573 U.S. 373, 381 (2014).

Lawson does not dispute that the initial seizure of her cell phone was lawful. However, a seizure lawful at its inception may still violate the Fourth Amendment if "its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment[]." *United States v. Jacobsen*, 466 U.S. 109, 113, 124 (1984). "Thus, even a seizure based on probable cause is unconstitutional if the police act with unreasonable delay in securing a warrant." *See Mitchell*, 565 F.3d at 1350–51 (quotations omitted). "The reasonableness of the delay is determined in light

of all the facts and circumstances, and on a case-by-case basis." *Id.* at 1351.

Factors relevant to the reasonableness of the delay include (1) "the significance of the interference with the person's possessory interest"; (2) "the duration of the delay"; (3) "whether or not the person consented to the seizure"; and (4) "the government's legitimate interest in holding the property as evidence." *See United States v. Laist*, 702 F.3d 608, 613–14 (11th Cir. 2012). Thus, applying the rule of reasonableness requires "a careful balancing of governmental and private interests." *Mitchell*, 565 F.3d at 1351 (quotations and citations omitted). "When balancing these interests, we are also obliged to take into account whether the police diligently pursued their investigation." *Laist*, 702 F.3d at 614 (alteration adopted) (quotations omitted). Accordingly,

> among other factors, we consider the nature and complexity of the investigation and whether overriding circumstances arose, necessitating the diversion of law enforcement personnel to another case; the quality of the warrant application and the amount of time we expect such a warrant would take to prepare; and any other evidence proving or disproving law enforcement's diligence in obtaining the warrant. These factors are by no means exhaustive, but they are the most relevant when we seek to balance the privacy-related and law enforcement-related concerns at stake in cases of this kind.

*Id.* (quotations and citations omitted). In other words, "this balancing calculus is fact-intensive" and, as a result, there is no bright line rule concerning how long of a delay is presumptively reasonable or unreasonable. *Id.*

Here, the district court did not err in denying Lawson's motion to suppress because the 12-day delay between the seizure of Lawson's phone and the completion of the search warrant application was not unreasonable under the totality of the circumstances. We agree that Lawson had a heightened possessory interest in her cell phone and that the government significantly interfered with that interest when it seized the phone. *See Riley*, 573 U.S. at 403 (emphasizing that the seizing of modern-day cell phones raises significant Fourth Amendment concerns due to the amount of personal and private information that are typically stored on the phones). However, the weight of this factor in the balancing calculus is diminished by the fact that Lawson never requested the phone's return during that 12-day period. *See United States v. Johns*, 469 U.S. 478, 487 (1985) (reasoning that the defendants failed to demonstrate that the government's conduct relating to the search of their property adversely affected their possessory interests protected by the Fourth Amendment where they "never sought return of the property"); *United States v. Stabile*, 633 F.3d 219, 235 (3d Cir. 2011) (concluding three-month delay in obtaining a warrant, caused by the lead agent's assignment on a protective Secret Service detail, was reasonable where the defendant did not request return of his hard drive until 18 months after the initial seizure).

Additionally, we agree with the district court that Inspector Greenberg acted diligently in obtaining the warrant. For instance, he testified that: (1) he was the sole agent working on a complex fraud investigation involving the arrest of ten people across multiple states; (2) he worked on numerous other warrants and case documentation issues during the alleged period of delay, including handling the subpoenas and warrants for Lawson's bank accounts upon learning that Lawson was moving money following her arrest; and (3) he sent a draft of the search warrant application to the U.S. Attorney's Office within a week of the seizure. *Laist*, 702 F.3d at 614. All of those factors weigh heavily in favor of the conclusion that Inspector Greenberg acted diligently.

Lawson contends that her case is similar to that of *Mitchell*, but her argument is unpersuasive. In *Mitchell*, we held that law enforcement's 21-day delay in obtaining a search warrant after seizing the defendant's computer was unreasonable because the government failed to offer a "compelling justification for the delay." 565 F.3d at 1351–53. Rather, the only reason offered for the delay was that the lead agent attended a two-week training program shortly after the seizure and was unavailable to draft the warrant, and the agent felt that there was no rush to get the warrant. *Id.* at 1351. We deemed this justification insufficient, noting that the agent had "two and one-half days" after seizing the computer and before his departure for the training program to draft something. *Id.* Moreover, there was a second agent on the case that could have secured a warrant in the lead agent's absence, but he failed to do so. *Id.* Thus, given the totality of the

circumstances, we concluded that the three-week delay was unreasonable.

Nevertheless, we cautioned in *Mitchell* that "there may be occasions where the resources of law enforcement are simply overwhelmed by the nature of a particular investigation, so that a delay that might otherwise be unduly long would be regarded as reasonable." *Id.* at 1353. We reasoned that Mitchell's case was not one of those situations, because the officers had seized "a single hard drive" and then made "[n]o effort . . . to obtain a warrant within a reasonable time because law enforcement officers simply believed that there was no rush." *Id.* In other words, while we found the three-week delay in *Mitchell* an unreasonable delay, we made clear that depending on the circumstances, such a delay could be reasonable. *Id.*

Unlike in *Mitchell*, we believe that Lawson's case presents a circumstance where "the resources of law enforcement [were] simply overwhelmed by the nature of [the] particular investigation," such that the 12-day delay in this case was reasonable. *Id.* at 1353. As discussed above, Inspector Greenberg was the sole agent working on this complex fraud scheme investigation involving ten defendants scattered throughout the country. And many things came up during that 12-day delay that necessitated the diversion of Inspector Greenberg's attention from preparing the search warrant for Lawson's phone, such as her and some of her co-conspirators' attempts to move money following their arrests.

Accordingly, we conclude that, under the totality of the circumstances, the delay in this case between the seizure of Lawson's cell phone and the application of the search warrant was reasonable, and the district court did not err in denying Lawson's motion to suppress.

## B. Sufficiency of the Evidence for Wire Fraud (Counts 2–8) and Mail Fraud (Count 12)

Lawson argues that the evidence was insufficient to sustain her wire fraud convictions in Counts 2 through 8 and her mail fraud conviction in Count 12 because the government failed to present evidence from which the jury could conclude that she knew that the amount of the EIDL application advance was based on the number of employees, citing the SBA representative's testimony that she did not know whether this information was public knowledge.    Additionally, Lawson argues that there was insufficient evidence to convict her of Counts 2, 3, 4, 6, and 7 because there was no evidence presented to show that those EIDL applications contained false information.

"We review the sufficiency of evidence to support a conviction *de novo,* viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007).    The test for sufficiency of evidence is identical for direct and circumstantial evidence, "and no distinction is to be made between the weight given to either direct or circumstantial evidence." *United States v.*

*Mieres-Borges*, 919 F.2d 652, 656–57 (11th Cir. 1990).  Proof of an element of a crime "may be established through circumstantial evidence or from inferences drawn from the conduct of an individual." *United States v. Utter*, 97 F.3d 509, 512 (11th Cir. 1996). "But where the government relies on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict." *United States v. Wenxia Man*, 891 F.3d 1253, 1265 (11th Cir. 2018) (alteration adopted) (quotations omitted).

"A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Frank*, 599 F.3d 1221, 1233 (11th Cir. 2010); *see also United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006) ("[T]he issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt."), *abrogated on other grounds by United States v. Di-Falco*, 837 F.3d 1207, 1216 (11th Cir. 2016). "[T]he evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Watts*, 896 F.3d 1245, 1251 (11th Cir. 2018) (quotations omitted).

To sustain a conviction for wire fraud, the government had to prove beyond a reasonable doubt that Lawson "(1) participated in a scheme or artifice to defraud; (2) with the intent to defraud; and (3) used, or caused the use of, interstate wire transmissions for

the purpose of executing the scheme or artifice to defraud."[18] *United States v. Machado*, 886 F.3d 1070, 1082–83 (11th Cir. 2018). With regard to mail fraud, "[a]side from the means by which a fraud is effectuated"—*i.e.*, meaning through the wires versus through the mail—"the elements of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, are identical." *United States v. Ward*, 486 F.3d 1212, 1221 (11th Cir. 2007) (footnotes omitted).

> A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property. A misrepresentation is material if it has a natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed.

*United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (citations and quotations omitted).

"Intent to defraud" means an intent "to use deception to cause some injury"—*i.e.*, "to obtain, by deceptive means, something to which the defendant is not entitled." *United States v. Waters*, 937 F.3d 1344, 1352 (11th Cir. 2019). Additionally, "the government must prove that [the defendant] knew that [she was] making false statements or [was] acting with reckless indifference to the truth." *United States v. Bell*, 112 F.4th 1318, 1332 (11th Cir.

---

[18] Lawson stipulated at trial that the text message communications alleged in Counts 2 through 8 "caused wire communications that were transmitted in interstate commerce."

2024), *petition for cert. filed* (No. 24-972) (U.S. Mar. 11, 2025).  "[A] jury may infer the 'intent to defraud' from the defendant's conduct and circumstantial evidence.  Evidence that the defendant profited from a fraud may also provide circumstantial evidence of the intent to participate in that fraud."  *Machado*, 886 F.3d at 1083.

Lawson challenges only the sufficiency of the evidence as to the material misrepresentation element.  Specifically, she contends that because there was no evidence that she was aware that the amount of the EIDL advance was tied to the number of employees ($1,000 per employee with a cap of $10,000), the government failed to show that she made a material misrepresentation in the EIDL applications that served as the basis for Counts 2 through 8.  Relatedly, she argues that the government failed to show that the information in the EIDL applications that served as the basis for Counts 2, 3, 4, 6, and 7, was in fact false.  We disagree.

Lawson cites no authority for the proposition that the government had to prove that she knew that the amount of the EIDL advance was tied to the number of employees in order to convict her of wire fraud or mail fraud.  Indeed, neither the amount of the EIDL advance or the number of employees listed in the applications are elements of wire fraud or mail fraud.  Rather, all that mattered for purposes of the scheme to defraud element was whether the government submitted sufficient evidence to show that Lawson intentionally submitted applications that contained material misrepresentations (and those material misrepresentations did not have to relate specifically to the number

of employees).[19] As we explain further, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the verdict, the jury could have reasonably concluded that Lawson intentionally filed EIDL applications containing material misrepresentations.

Numerous text messages demonstrated that the EIDL applications contained knowing material misrepresentations, such as: (1) Lawson's statement to Solomon that Lawson listed on Solomon's EIDL application that Solomon did hair, even after Solomon told Lawson that she did not have any "side hustle"; (2) Lawson's statement to an applicant who inquired as to what Lawson listed as the type of business, that "Everyone is the same, independent contractor. Had ten employees. No one has nothing different outside of that, except the type of job they performed."; and (4) text messages between Lawson and Alicia discussing what type of business to list for Katie and Middleton on their EIDL

---

[19] Regardless, even assuming arguendo that the government had to show that Lawson knew the amount of the EIDL advance was tied to the number of employees listed in the applications, the government met that burden. Specifically, the government submitted an exhibit at trial of hundreds of pages of texts between Alicia and Lawson. In one of those texts, Lawson sent Alicia a screenshot of a summary of the EIDL program, which included a paragraph stating that "[t]he SBA was offering advances of $10,000 per applicant in the form of a grant. But due to high demand, it reduced grant amounts to $1,000 per employee as of January 2020, up to $10,000." Thus, the government established that she knew that she was making a material misrepresentation related to the number of employees and that the number of employees were tied to the amount of the EIDL advance.

applications. The government also presented testimony from numerous witnesses, including Jones (Count 5), Middleton (Count 8), Moffett, and Cooper who confirmed that their EIDL applications contained false information. Similarly, Montgomery, who was Nikia Wakefield's boyfriend in 2020, testified that Wakefield (Count Three) did not have a business. And finally, Inspector Greenberg and Boring testified that they could not find business registrations with the Secretary of State or the Georgia Department of Labor for any of the individuals listed in the EIDL applications in Counts 2 through 8.

Although the government did not present testimony from Tranesha (Count 2), Washington (Count 4), McFarland (Count 6), or Katie (Count 7) that their EIDL applications contained false information, the jury could have reasonably inferred from the text messages, and the testimony of Jones, Middleton, Moffett, Cooper, Inspector Greenberg, and Boring that those applications also contained material false misrepresentations. *Utter*, 97 F.3d at 512 (explaining that an element of a crime "may be established through circumstantial evidence or from inferences drawn from the conduct of an individual"); *United States v. Henderson*, 693 F.2d 1028, 1031 (11th Cir. 1982) ("[C]ircumstantial evidence is not testimony to the specific fact being asserted, but testimony to other facts and circumstances from which the jury may infer that the fact being asserted does or does not exist."); *Watts*, 896 F.3d at 1251 ("[T]he evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or

among the reasonable conclusions to be drawn from the evidence presented at trial.").

In sum, the evidence showed that Lawson intentionally participated in a scheme to defraud the government through fraudulent EIDL applications containing material misrepresentations—namely, that fake businesses existed—from which she gained profits. Accordingly, there was more than sufficient circumstantial evidence for the jury to find Lawson guilty beyond a reasonable doubt of the wire fraud charges in Count 2 through 8. *Machado*, 886 F.3d at 1082–83.

As for the mail fraud charge in Count 12, Montgomery testified that he did not have a business and that his PPP application contained false business information. He also testified that he mailed a check to Alicia for the fee and that in the "for" line of the check, he wrote "family," even though the check was not for family. And the government presented evidence that, after receiving money from applicants, Alicia sent Lawson money for her portion of the fees. Accordingly, there was more than sufficient evidence to convict Lawson of mail fraud. *See Ward*, 486 F.3d at 1221.

### C. *Sufficiency of the Evidence for Bank Fraud in Counts 10 and 11*

Lawson argues that the government failed to prove that she had an intent to defraud a financial institution as required to sustain

24-10561                Opinion of the Court                39

her bank fraud convictions in Counts 10 and 11.[20]  Additionally, she argues that the evidence was insufficient to show that the information in the PPP application for Count 11 was false because the applicant did not testify or state that the information was false.[21]

Lawson was charged with, and convicted of bank fraud, in violation of 18 U.S.C. § 1344 in Counts 10 and 11.  That statute provides that:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial

---

[20] We note that Lawson failed to move for a judgment of acquittal on Count 10 in the district court or otherwise argue that the evidence was insufficient to convict her on that count.  "Consequently, the conviction[] [on Count 10] will be upheld unless to do so would result in a manifest miscarriage of justice." *United States v. Thompson*, 610 F.3d 1335, 1338 (11th Cir. 2010).

[21] Lawson asserts that Count 11 "involved Tranesha Quarterman's EIDL application," but Lawson is mistaken.  Count 11 involved Arielle Dozier's PPP application.  We assume for purposes of this opinion that Lawson nevertheless intended to refer to Dozier.  Lawson's argument, however, that the jury could not have concluded that the information in Dozier's PPP application was false because she did not testify is unpersuasive.  The jury could have reasonably inferred that the application contained materially false information based on Inspector Greenberg's testimony and Boring's testimony that searches revealed no business registration or Department of Labor account linked to Dozier.

> institution, by means of false or fraudulent
> pretenses, representations, or promises;

> shall be fined not more than $1,000,000 or imprisoned
> not more than 30 years, or both.

18 U.S.C. § 1344. Thus, a conviction under § 1344(1) required the government to "prove: (1) that the defendant intentionally participated in a scheme or artifice to deprive another of money or property; and (2) that the intended victim was a federally insured financial institution." *United States v. McCarrick*, 294 F.3d 1286, 1290 (11th Cir. 2002). "To convict under § 1344(2), the government [had to] prove (1) that a scheme existed to obtain moneys, funds, or credit in the custody of a federally-insured bank by fraud; (2) that the defendant participated in the scheme by means of material false pretenses, representations or promises; and (3) that the defendant acted knowingly."[22] *Id.* "A [bank fraud] conviction can be sustained under either section when the indictment and jury

---

[22] In *Loughrin v. United States*, the Supreme Court held that convictions under § 1344(2) do not require proof of intent to defraud a bank. 573 U.S. 351, 359–62 (2014). However, during Lawson's trial, counsel for both parties generally argued that § 1344 required the intent to defraud a bank without differentiating between subsection (1) and (2), and the district court instructed the jury accordingly. Because no party objected below or on appeal to this error, we assume for the purposes of this appeal that the jury had to find an intent to defraud a bank in order to sustain Lawson's conviction under either § 1344(1) or § 1344(2). *See United States v. Martin*, 803 F.3d 581, 590 (11th Cir. 2015) (explaining that where the district court erroneously instructs the jury, without objection, that a certain element is required for an offense, that element becomes a necessary element that "the government [is] required to prove" (citing *United States v. Spletzer*, 535 F.2d 950, 954 (5th Cir. 1976))).

instructions, as in this case, charge both clauses." *United States v. Dennis*, 237 F.3d 1295, 1303 (11th Cir. 2001). "[C]ircumstantial evidence may prove knowledge and intent." *United States v. Williams*, 390 F.3d 1319, 1325 (11th Cir. 2004).

Viewing the evidence in the light most favorable to the government, we conclude that the government met its burden to prove bank fraud and Lawson's intent to defraud. The government presented evidence from which a jury could reasonably conclude that Lawson submitted PPP loan applications containing materially false information to Cross River Bank (a federally insured financial institution) on behalf of Montgomery (Count 10) and Dozier (Count 11), for businesses that did not exist. The government also presented evidence from which a jury could conclude that Lawson falsified the Schedule C documents attached to the applications based on her text exchange with Alicia and the testimony of Montgomery and Moffett that they never saw their respective PPP applications or the attached Schedule C documents. Taken together, this evidence is sufficient to establish that Lawson intentionally participated in a scheme to defraud Cross River Bank and obtain by deceptive means money to which neither she nor the loan applicants were entitled. *See United States v. Watkins*, 42 F.4th 1278, 1286–87 (11th Cir. 2022) (upholding a bank fraud conviction where the defendant misrepresented on a loan application the "true recipient of the loan" because a jury could have reasonably believed that, by concealing the true recipient, the defendant "sought to obtain, by deceptive means, something to which he was not entitled" (alterations adopted) (quotations omitted)).

### D.  Sufficiency of the Evidence for Money Laundering
### (Count 13)

Lawson argues that the evidence was insufficient to support her conviction for money laundering because the government failed to show that the money in question was "specifically tied to money" that came from the persons who testified at her trial or whose applications were presented to the jury.  In support, she notes that Downing testified that she could not be certain that the money used by Lawson to purchase the Mercedes came from a particular source.

To convict Lawson of money laundering, the government had to prove: (1) she "knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000"; and (2) the property was "derived from specified unlawful activity," namely, conspiracy to commit wire fraud as charged in Count 1. *See United States v. Silvestri*, 409 F.3d 1311, 1332–33 (11th Cir. 2005) (quotations omitted).  "[C]riminally derived property means any property constituting, or derived from, proceeds obtained from a criminal offense."    18 U.S.C. § 1957(f)(2) (quotations omitted).    "[T]he Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." *See id.* § 1957(c).  A defendant can be convicted of money laundering "where the funds involved in the transaction are derived from a commingled account of which only a part comes from specified unlawful activities." *United States*

24-10561            Opinion of the Court                43

*v. Cancelliere*, 69 F.3d 1116, 1120 (11th Cir. 1995) (quotations omitted).

When viewing the evidence in the light most favorable to the government, the jury could have reasonably concluded from Downing's testimony that Lawson purchased the Mercedes with more than $10,000 of criminal proceeds derived from the conspiracy to commit wire fraud. *See Silvestri*, 409 F.3d at 1332–33. Specifically, Downing testified that a $35,000 JPMorgan Chase cashier's check used to pay in part for the Mercedes had been funded entirely by the fees Lawson received from EIDL and PPP applications. She explained that there were no other sources of funds to Lawson's account during the relevant time period, and that the account did not otherwise have enough money to cover the check. And the jury was entitled to credit this testimony and reasonably conclude that Lawson engaged in money laundering by purchasing the Mercedes with the ill-gotten gains. *Watts*, 896 F.3d at 1251 ("[T]he evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial.").

Contrary to Lawson's argument, the government was not required to show that the money used to purchase the Mercedes was specifically tied to any of the individuals who testified at Lawson's trial or to any of the specific EIDL and PPP applications that were presented to the jury. Rather, all the government had to show was that the funds were derived from the overall conspiracy

to commit wire fraud as charged in the indictment, which it did through Downing's testimony. *Silvestri*, 409 F.3d at 1332–33; 18 U.S.C. § 1957(f)(2).

Additionally, contrary to Lawson's claim, the government is not required to "trace the origins of all funds" in an account, like Lawson's, that contains commingled funds to "ascertain exactly which funds were used for what transaction." *See United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999). Lawson argues, as she did to the jury, that she could have used legitimate funds to purchase the Mercedes. Our job, however, is to review the sufficiency of the evidence, not choose between competing interpretations of that evidence. The jury was free to choose between reasonable constructions of the evidence, and Lawson has failed to show that the jury could not have found her guilty of money laundering based on the evidence presented. *Watts*, 896 F.3d at 1251; *Frank*, 599 F.3d at 1233 ("A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence."). Accordingly, she is not entitled to relief on this claim.

### III.  Conclusion

For the above reasons, we affirm Lawson's convictions.

**AFFIRMED.**